**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NORMAN ROBERTS, on behalf of himself and all those similarly situated,<br><br>          Plaintiff,<br><br>          v.<br><br>NAVIOS MARITIME HOLDINGS, INC., ANGELIKI N. FRANGOU, EFSTATHIOS LOIZOS, SPYRIDON MAGOULAS, GEORGE MALANGA, JOHN STRATAKIS, and SHUNJI SASADA,<br><br>          Defendants. | Case No. _____<br><br>Judge:<br><br><br><br>**JURY TRIAL DEMANDED** |

## VERIFIED STOCKHOLDER CLASS ACTION COMPLAINT

Plaintiff Norman Roberts ("Plaintiff"), by and through his undersigned counsel, brings this Verified Stockholder Class Action Complaint against Navios Maritime Holdings, Inc. ("Holdings" or the "Company") and certain of its directors (the "Director Defendants"). Plaintiff alleges the following based upon knowledge as to himself, and upon information and belief, including the investigation of Plaintiff's counsel and review of publicly available information, as to all other matters. Plaintiff hereby demands a trial by jury.

## NATURE OF THE ACTION

1.    Holdings is a dry-bulk shipping company. Holdings has two series of preferred stock outstanding that trade exclusively on the New York Stock Exchange (the "NYSE") in the form of American depositary shares (the "ADS").

2.    This action arises because the largest shareholder and board of directors (the "Board") of Holdings is trying to squeeze out the Company's preferred stockholders through

highly coercive exchange offers conducted in flagrant violation of the contractual and fiduciary rights of the preferred stock investors.

3.      Currently, the holders of the ADS enjoy numerous rights, including the right to receive cumulative accrued dividends and the right to elect a director to the Board if the Company fails to pay them dividends for six quarters.  Two-thirds of ADS holders must consent to any material adverse amendment to these rights.

4.      Over the last several years, Holdings has struggled.  In February 2016, the Company suspended dividend payments to ADS holders in order to conserve cash.  As per the terms of the operative certificate of designations (the "Certificates of Designation"), Holdings must repay all accrued and unpaid preferred dividends before it is able to return capital to common stockholders.

5.      In addition, once Holdings missed one quarter of dividends, it became obliged to use commercially reasonable efforts to obtain an amendment to the Company's Certificate of Incorporation to allow the preferred investors to elect a director to the Board as soon as the Company missed six quarters of dividends.  Having already missed two quarters and soon to miss a third without taking any action to obtain such an amendment, Holdings' Board saw its grip on power slipping away.  Drastic measures were needed.

6.      Over recent months, Holdings' and the shipping industry's prospects have improved.  Now, the Company is attempting to squeeze out the ADS holders in an apparent attempt to ensure that the benefit of this recovery inures solely to the common stockholders, including Angeliki Frangou, the Holdings' Chairman and CEO who owns 28.5% of the outstanding common stock.

7.     To that end, on September 19, 2016, the Company launched a highly coercive exchange offer and consent solicitation for each of the Company's outstanding series of preferred stock (the "Exchange Offers" and the "Consent Solicitations").   In the Exchange Offers, the Company is offering ADS holders a modest supposed premium for their ADS.   However, Holdings has declared that whenever an investor tenders an ADS, the act of tendering (*i.e.*, giving up the preferred securities in exchange for the offered payment) also constitutes a consent to amend the Certificates of Designation in such a way so as to eliminate all of the critical rights currently enjoyed by ADS holders, including the right to receive dividends and the right to elect a director if dividends go unpaid for six quarters.   If the required two-thirds of the ADS holders tender their shares, Holdings will be able to return capital to common stockholders and effectively undermine any rights of any remaining ADS holders.

8.     By structuring the Exchange Offers in this manner, Holdings and the Board are improperly coercing ADS holders to tender their shares into the Exchange Offers.   No rational person would want to remain an ADS holder after losing the right to receive dividend payments and to enjoy any other basic protection.   The remaining ADS would become essentially worthless if Holdings consummates the Exchange Offers.   Thus, any rational ADS holder is likely to tender in order to avoid being left holding an empty bag.

9.     The only way a rational ADS can avoid tendering into the Exchange Offer is if he or she believes a large enough group of holders is committed to not tendering their shares in order to defeat the two-thirds minimum condition.   Plaintiff is currently attempting to organize such a group.   However, if Plaintiff is unsuccessful, he, the remaining ADS holders, and the ADS holders who were coerced to tender will be entitled to judicial relief to restore them to the position they

were in previously, either by invalidating any effort to strip the preferred of their rights or through an award of money damages from the members of the Board.

## PARTIES

### A.     Plaintiff

10.     Plaintiff Norman Roberts ("Plaintiff") has been a Series G ADS holder since November 26, 2014 and a Series H ADS holder since December 10, 2014.  Plaintiff is a resident of Florida.

### B.     Defendants

11.     Defendant Navios Maritime Holdings, Inc. ("Holdings" or the "Company") is a world-wide maritime shipping and logistics company that focuses on the transport of dry bulk commodities, including iron ore, coal, and grain.  Holdings sits at the center of a web of interconnected shipping companies that each utilize the Navios brand.  Holdings is incorporated under the laws of the Republic of the Marshall Islands and has its principal executive offices in Monte Carlo, Monaco.  Holdings common shares and ADS exclusively trade on the New York Stock Exchange ("NYSE").

12.     Angeliki Frangou ("Frangou") has served as the Chairman and CEO of Holdings since August 2005.  In addition, she has served as the Chairman and CEO of Navios Maritime Acquisition Corporation ("Acquisition") since March 2008, of Navios Maritime Partners L.P. ("Navios Partners"), a partnership controlled by Holdings, since August 2007, and of Navios Maritime Midstream Partners L.P. ("Navios Midstream"), a partnership controlled by Acquisition, since October 2014.  Frangou has served as the Chairman of Navios South American Logistics Inc. ("Navios South American"), which is majority owned by Holdings, since its inception in December 2007.  Before her involvement with Holdings, Frangou served as the Chairman, CEO and President of International Shipping Enterprises, Inc. ("International Shipping"), which

4

acquired Holdings in 2005.  From 1990 through 2001, Frangou served as the CEO of Franser Shipping S.A. ("Franser Shipping").  Furthermore, Frangou controls and is the Chairman of the investment firm IRF European Finance Investments Ltd. ("IRF") and has previously served on the board of Marfin Investment Group.  Frangou owns approximately 28.5% of the outstanding common stock of Holdings and has stated her intention to acquire an additional $10 million worth of common stock.  Frangou does not own any ADS.  Upon information and belief, Frangou's last known United States address is 140 W 46th St., Apt. 6501, New York, NY 10019.

13.     Efstathios Loizos ("Loizos") has served as a director of Holdings since July 2010. Additionally, Loizos served as a director of Navios Partners from October 2007 to June 2010. Upon information and belief, Loizos's last known United States address is 334 E. 26th St., Apt. 21A, New York, NY 10010.

14.     Spyridon Magoulas ("Magoulas") has served as a director of Holdings since its inception and prior to that served as a director of International Shipping.  Upon information and belief, Magoulas's last known United States address is 2508 38th St., Astoria, NY 11103.

15.     George Malanga ("Malanga") has served as a director of Holdings since April 2010. Malanga has worked at Bank of New York Mellon ("BNYM") for twenty-nine years and currently serves as BNYM's Chief Credit Officer and a member of its Operating Committee.  Upon information and belief, Malanga's last known United States address is 28 Sentinel Dr., Basking Ridge, NJ 07920.

16.     John Stratakis ("Stratakis") has served as a director of Holdings since its inception and prior to that served as a director of International Shipping.  Upon information and belief, Stratakis's last known United States address is 169 Manhasset, NY 11030.

17.     Shunji Sasada ("Sasada") has served as a director of Holdings and as the President of Navios Corporation, Holding's wholly owned subsidiary, since January 2015.  Sasada has been an employee of Holdings since May 1997, serving in additional capacities such as COO and Senior Vice President of Fleet Development of Navios Corporation.  Additionally, Sasada has served as director of Navios Partners since August 2007 and as a director of Navios Midstream since October 2014.  Upon information and belief, Sasada's last known United States address is 46 Lockwood Ave., Old Greenwich, CT 06840.

18.     The individuals listed in ¶¶ 12-17 above are collectively referred to herein as the "Director Defendants."

### C.     Relevant Non-Parties

19.     Vasiliki Papaefthymiou ("Papaefthymiou") has served as Executive Vice President—Legal and as a director of Holdings since its inception and prior to that served as a director of International Shipping.  Papaefthymiou also serves as Executive Vice President—Legal of Navios South American, Secretary of Navios Partners, Secretary of Acquisition, and Secretary of Navios Midstream.  Finally, Papaefthymiou served as the General Counsel of Franser Shipping from 1991 to 2001.

### JURISDICTION

20.     This Court has jurisdiction over this Action pursuant to 28 U.S.C. § 1332 in that diversity exists between Plaintiff and each of the Defendants and the amount in controversy exceeds $75,000, exclusive of interests and costs.

21.     This Court has personal jurisdiction over each Defendant because the Director Defendants caused Holdings to engage in the Exchange Offers and Consent Solicitations, which seek to coercively and improperly acquire all of the outstanding ADS that are exclusively traded

on the NYSE.  The harm imposed by these actions exclusively falls on a market located in New York and investors in that market.

22.     Moreover, BNYM, which is headquartered in New York, is the "Depositary" for the Company's Preferred Stock and is technically the only "holder" of the Preferred Stock, whereas public stockholders own the ADS.  BNYM also serves as the Exchange Agent for the Exchange Offers.  This means that ADS holders are being asked to tender their shares to BNYM and BNYM will be the entity that will deliver any shares of common stock or cash to the ADS holders who tender.

23.     Holdings also maintains an office in New York.  According to its most recent annual report on Form 20-F, which was filed with the SEC on April 25, 2016, Holdings leases office space at 825 Third Avenue, New York, New York.  The Form 20-F also states that "Holdings sublets a portion [of the premises covered by the lease] to a third party pursuant to a sub-lease" and that "Holdings and its subsidiaries employed . . . 12 employees in its New York office."

24.     Additionally, upon information and belief, Defendants Frangou, Loizos, Magoulas, and Stratakis maintain residences in New York.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the ADS that are the subject of Plaintiff's claims trade exclusively in this district and the Defendants directed their activities towards this district.  Thus, all of the harm imposed by these actions falls upon a market in this district.

## SUBSTANTIVE ALLEGATIONS

### A.     Background on Holdings

26.     Holdings is a global maritime shipping and logistics company that focuses on the transport of dry bulk commodities, including iron ore, coal, and grain.  Through a web of

complicated stock ownership and corporate entities, Holdings controls a myriad of other shipping corporations that operate under the "Navios" brand.

27.     In recent years, the dry bulk shipping industry, including Holdings, has been suffering from unprecedented declines in shipping rates and what equity analysts at Wells Fargo Securities ("Wells Fargo") described in February 25 and March 11, 2016 reports as "pervasive weakness."

28.     In 2015, the dry bulk industry had both a supply and demand problem, with too many operating ships and the first year-over-year decline in seaborne iron ore, coal, and grain since 1998.  As a result, Holdings saw its adjusted EBITDA decline from $191.4 million in 2014 to $133.4 million in 2015, which resulted in Holdings generating a mere $7 million of cash from operating and investing activities.

29.     This negative market trend continued into 2016.  For example, the Baltic Dry Index ("BDI"), which provides an assessment of the price of shipping major raw materials by sea, hit a 30-year low of 290 in February 2016, which is far below the all-time high point of 11,793 reached in May 2008.  Before this recent decline, the previous 30-year low was 513, which was reached in February 2015.  Moreover, Wells Fargo stated that it did not expect the dry bulk market to recover until 2018.  In an October 15, 2015 analyst report, J.P. Morgan Securities LLC ("JP Morgan") forecasted that dry bulk rates would decline in 2016, stabilize in 2017, but would not even reach the mid-point of an upward turn in the cycle until the end of 2019 at the earliest.

30.     The decline in the dry bulk shipping market put enormous financial pressure on Holdings.  In Holdings' 2015 fourth quarter and full year earnings press release, dated February 23, 2016, Frangou acknowledged the difficult state of the shipping market and stated that "In light of the prolonged market weakness, we have adopted measures to reduce our cash requirements,

8

without having to sell off assets and while honoring our obligations.  We have resourcefully established cash flow needed in the medium term to sustain the company until charter rates improve."

31.     In an accompanying presentation dated February 23, 2016, Holdings announced that it was suspending its dividends on both common and preferred stock in order to save $41 million annually.[1]  Frangou added that with the savings, Holdings only had enough liquidity to last through 2017.  A few months later, on June 7, 2016, the Company received notice from the NYSE that it was not in compliance with the NYSE's continued listing standards because the average closing price of Holdings' common stock over 30 consecutive trading days was less than $1.00 per share.

32.     However, in recent months, market conditions and the Company's performance have begun to stabilize and improve.  On September 19, 2016, the BDI reached 836 and, over the following week, it reached a high of 941 on September 23, 2016, thus indicating an improvement in the dry bulk shipping industry.

33.     On September 1, 2016, the NYSE notified the Company that it was once again in compliance with its continuing listing standards because the Company's stock had a minimum average closing price over the previous 30 trading days above $1.00.  On September 19, 2016, Holdings increased its liquidity by entering into a revolving loan facility with Acquisition, Holdings' publicly traded subsidiary, that provides Holdings the option to borrow as much as $70 million from Acquisition.  In a September 20, 2016 analyst report, a Deutsche Bank analyst stated

---

[1] The Company had previously announced the suspension of dividends on common stock in November 2015.

that he did not believe Holdings has a near-term liquidity issue and estimated the Company could be net cash flow breakeven in 2017.

34.     In light of this upswing in the Company's prospects, the Holdings' board of directors (the "Board") has apparently seen an opportunity to unfairly and coercively squeeze out the holders of the Company's ADS in order to eliminate the accumulation of accrued dividends that must be paid to them before dividends can again be paid to common stockholders, and to avoid allowing the preferred investors to elect a member to the Board.

**B.     Holdings' Preferred Stock**

35.     Holdings has two outstanding series of preferred stock: 8.75% Series G Cumulative Redeemable Perpetual Preferred Stock ("Series G") and 8.625% Series H Cumulative Redeemable Perpetual Preferred Stock ("Series H" and, collectively with Series G, the "Preferred Stock").  The Preferred Stock trades on the NYSE in the form of American Depository Shares (the "ADS"), each of which represents a $1/100^{th}$ interest in a preferred share.  Each ADS has a liquidation preference and book value of $25 per share.  Currently, there are 2,000,000 Series G ADS outstanding and 4,800,000 Series H ADS outstanding.

36.     The Series G Stock/ADS and the Series H stock/ADS are each governed by "Certificates of Designation" that set forth their rights and protections.  Each Certificate of Designation contains the same rights and protections that are relevant to this action and thus they will be discussed jointly herein.

37.     Under the terms of the Certificates of Designation, dividends are cumulative and accrue quarterly.  If Holdings fails to make a quarterly dividend payment to the holders of Preferred Stock, the dividend amount will still accrue and the Company must repay any accrued and unpaid Preferred Stock dividends before it can pay dividends on any common shares.  In February 2016,

Holdings announced that it was suspending the payment of dividends on the Preferred Stock in an effort to conserve cash until market conditions in the shipping industry improved.

38.     Since that time, the Company has missed two quarters worth of preferred dividend payments and is expected to miss a third imminently on October 15, 2016.  Specifically, the Company has missed two Series G quarterly dividends of $0.546875 per ADS, or $1.1 million in total per quarter, as well as two Series H quarterly dividends of $0.539063 per ADS, or $2.6 million in total per quarter.  Taken together, Holdings has already missed $7.4 million worth of preferred dividend payments and this amount is expected to rise to $11.1 million shortly.

39.     The Certificates of Designation provide that if preferred dividends are in arrears for six or more quarterly periods, then the Preferred Stockholders have the right to collectively elect one member to the Holdings Board or receive an increase in the applicable dividend rate.  Thus, if the Company fails to pay preferred dividends for another four quarters, holders of Preferred Stock would be able to elect their own representative to the Board as long as the Company properly amends its Articles of Incorporation to allow for such action.

40.     The Certificates of Designation require the Company, upon missing one quarterly ADS dividend payment, to use commercially reasonable efforts to obtain an amendment to its Articles of Incorporation to allow the ADS holders to exercise this voting right.  If the Articles of Incorporation are not amended, then the ADS dividend rate increases by 25 basis points until such amendment is effective.  There is no indication that the Company has taken any steps whatsoever to obtain an amendment to the Articles of Incorporation.

41.     Moreover, unless cumulative preferred dividends have been paid in full, the Company may not redeem, repurchase, or otherwise acquire its common stock or ADS, except through an offer made to all of the ADS holders.

42.    The Series G and Series H Certificates of Designation may not be amended in a manner that adversely affects the preferences, powers, or rights of the respective class of preferred stockholders without the affirmative vote or consent of the holders of at least two-thirds of the outstanding Series G or Series H stock.  Moreover, any shares of Series G or Series H Preferred Stock/ADS that are held by the Corporation, any of its subsidiaries, or any of its affiliates are not entitled to vote on such matters.

**C.    Holdings Launches an Exchange Offer and Consent Solicitation for the Preferred Stock**

43.    On September 19, 2016, Holdings filed forms with the SEC to launch an exchange offer and consent solicitation for each of the Series G and Series H ADS (respectively, the "Exchange Offers" and "Consent Solicitations").  Critically, each Exchange Offer is subject to a waivable condition that two-thirds of the respective Series G and Series H ADS holders tender their shares.  The Series G Exchange Offer and Consent Solicitation is independent from the Series H Exchange Offer and Consent Solicitation and vice versa.  Thus, it is possible that one is consummated while the other is not.

44.    The Exchange Offers are currently scheduled to expire at 11:59 PM on October 17, 2016.  The Exchange Offers and Consent Solicitations are a coercive and improper attempt by Holdings to eliminate the rights and preferences of the holders of Series G and Series H ADS.

45.    In the Exchange Offers, Holdings is offering to acquire each Series G ADS for either $5.85 in cash or 4.77 shares of Holdings common stock and each Series H ADS for either $5.75 in cash or 4.69 shares of common stock.  Holders who tender will be able to choose which form of consideration they want to receive, subject to a proration mechanism that ensures no more than 50% of the total number of Series G ADS that are tendered and no more than 50% of the Series H ADS that are tendered are exchanged for the cash consideration.

46.     Holdings determined the value of the consideration included in the Exchange Offers by first calculating the volume weighted average price (the "VWAP") at which each of the Series G and Series H ADS traded on the NYSE for the twenty trading days immediately preceding September 19, 2016.  Then, Holdings decided to offer an option of cash consideration that was worth 110% of each VWAP or common stock consideration worth 105% of each VWAP.  Notably, the value of the offered consideration is well below the $25 face value of each of the ADS.

47.     Holdings did not obtain an opinion from an investment bank opining on the fairness of the proposed consideration to the ADS holders.

48.     Through the Exchange Offers and Consent Solicitations, Holdings is seeking to acquire the required two-thirds consent from each of the Series G and Series H ADS holders so that it can amend the terms of the Certificates of Designation to strip the preferred stockholders of nearly all of their critical rights.  Specifically, amongst other things, Holdings is seeking to (i) eliminate the requirement that it pay preferred stockholders accrued dividends, including both the dividends that have already accrued since the suspension of dividend payments in February 2016 and future dividends; (ii) eliminate the requirement that preferred stockholders receive dividends they are owed before dividends can be paid to common stockholders; (iii) eliminate the prohibition on repurchasing or redeeming common or preferred shares unless all accrued dividends have been paid to preferred stockholders; (iv) eliminate the preferred stockholders' right to elect directors or increase their dividend rate if dividends are in arrears for at least six quarters; and (v) lower the required percentage to amend the Certificates of Designation in the future from two-thirds to a simple majority.

49.     Under the proposed amendments to the Certificate of Designations, it appears that ADS holders will have no right to receive any dividends, thus allowing the Company to pay dividends on, and repurchase, common shares while ignoring the ADS holders.

**D.     The Exchange Offers and the Consent Solicitations Are Coercive**

50.     If the Exchange Offers simply offered a financial inducement to tender, ADS holders would have no good cause to complain.  Each ADS holder could make his or her own decision, based on the merits of the deal, about whether to accept the consideration offered by Holdings in the Exchange Offer and that decision would have no effect on those who choose not to tender.

51.     However, Holdings inextricably tied the Exchange Offers to the Consent Solicitations by placing a two-thirds minimum condition on the Exchange Offers and by declaring that a tender by a Series G or Series H ADS holder "will constitute the granting of consent by such holder to the proposed amended and restated Series G Preferred or Series H Preferred certificate of designation, as applicable."  Moreover, Holdings is only seeking the consent from those ADS holders who are also tendering—it is "not soliciting and will not accept consents from holders who are not tendering their [ADS] pursuant to [the Exchange Offers.]"

52.     Thus, Holdings is attempting to have ADS holders who are giving up the ownership of their preferred shares also provide the necessary consent to eliminate the rights of every other ADS holder who decides to not tender.  Those who decide not to tender will have no say on the elimination of their rights.  This combination makes the Exchange Offers and Consent Solicitations highly coercive.

53.     The Exchange Offers are coercive because rational stockholders are pressured to tender their shares, regardless of their views on the economic merits of the offered consideration,

14

in order to avoid remaining holders of the ADS after they have been stripped of their key rights and protections.

54.     If the Exchange Offers are consummated, ADS holders will lose their right to receive the $7.4 million (soon to be $11.1 million) in accrued dividends they are currently entitled to as well as any future dividends they would have been entitled to.  The proposed amendments to the Certificates of Designation would permit the Company to pay dividends to, and repurchase the shares of, common stockholders, while ignoring the remaining ADS holders.  ADS holders will also lose their right to elect a director to represent their interests if the Company continues not to pay them their dividends.

55.     As a result of the elimination of these critical rights, the value of any remaining ADS will likely plummet to zero if the Exchange Offers are consummated.  It is unlikely that remaining ADS investors will be able to sell their shares for any material value if holders are no longer entitled to receive dividends and no longer hold any substantial rights.  Rather, any remaining ADS holders will be left holding an empty bag.

56.     Thus, in order to avoid being left with essentially worthless ADS if two-thirds of their fellow ADS holders decide to tender, even the ADS holders who view the consideration offered in the Exchange Offers as grossly inadequate will face an undue pressure to tender, rather than be left with nothing at all.

57.     Moreover, in SEC filings setting forth the Exchange Offers and Consent Solicitations, Holdings threatened the ADS holders by stating that if a sufficient number of their fellow holders tender their shares, the ADS shares may be delisted from the NYSE, thus further hampering their liquidity and value.  Finally, Holdings also threatened ADS holders into tendering

by stating that if a sufficient number of holders tender, the IRS may treat the amendment of the Certificates of Designation as a distribution subject to federal taxes.

58.     Thus, ADS holders are faced with two options and a choice no public stockholder should ever be forced to make.  They can tender their shares and receive inadequate consideration in return.  Alternatively, if an ADS holder refuses to tender, (i) he or she risks losing all key rights and protections; (ii) the ADS may be delisted from the NYSE; and (iii) the ADS holders may have to pay a tax despite the fact that they are retaining their property which will have decreased in value.  Any stockholder acting in his or her own self-interest will feel compelled to tender his or her shares given the severe negative consequences they will face if two-thirds of their fellow ADS holders tender and the Exchange Offers are consummated.

59.     These actions appear designed to benefit the Company's common stockholders at the expense of the ADS holders.  This includes Defendant Frangou, who owns 28.5% of the outstanding common stock, and the other directors, many of whom hold numerous positions across the Navios empire at the behest of Frangou.[2]  As explained above, the prospects for the Company and the industry appear to be improving.  However, under the current terms of the Certificates of Designation, the ADS holders would be able to enjoy the proceeds of this recovery well before the common stockholders, as the Company would be required to pay them all accrued dividends before

---

[2] Recent events indicated that Frangou might be in need of immediate liquidity.  According to October 6, 2016 articles in *Splash 24/7* and *Cyprus Mail*, Frangou is among a group of sixteen individuals facing felony money laundering charges involving Marfin Investment Group ("MIG") and Marfin Popular Bank.  The charges relate to unsecured loans totaling €200 million that were provided to IRF, an investment vehicle controlled and Chaired by Frangou, by Marfin Popular Bank.  Prosecutors charge that the loans appear to have been granted for the purchase of shares in MIG and Marfin Popular Bank.  The loans have yet to be repaid.  Notably, Marfin Popular Bank has also served as a lender to Navios South American.

returning capital to common stockholders.[3]  If the Exchange Offers and Consent Solicitations are successful, the common stock will essential move ahead of the ADS in the capital structure and retain all of the benefits of the recovery.

60.    Rational ADS holders can only avoid tendering if they form a large enough group that is committed to not tender so as to defeat the Exchange Offers and avoid the "tragedy of the commons" trap imposed by the Defendants.  Plaintiff is taking this path and is currently attempting to organize a sufficient group of ADS holders that oppose the Exchange Offers and Consent Solicitations and will agree not to tender their shares.  However, if Plaintiff is unsuccessful in this endeavor, he, the remaining ADS holders, and the ADS holders who tendered, will be entitled to judicial relief.

61.    Moreover, even if Plaintiff is successful in ensuring that less than two-thirds of each series of ADS tender, those who did tender their shares into the offer as a result of the improper coercion may still be harmed.  Holdings is currently stating that the Exchange Offers are conditioned on two-thirds of the respective Series G and Series H ADS holders tendering. However, at any time up to the expiration of the Exchange Offers, it may waive that condition and accept any shares that are tendered, even if it is less than two-thirds of the outstanding shares.  As a result, those who tendered because they felt coerced will be doubly harmed.  They will receive inadequate consideration for their ADS and the ADS that remain outstanding will still enjoy all of the rights they currently enjoy.  Such tendering holders certainly would not have tendered if they

---

[3] In November 2015, the Board approved a share repurchase program for up to $25 million in Holdings common stock.  Nearly $24 million in authorized repurchases remain outstanding under this program.  If the Exchange Offers and Consent Solicitations are successfully completed, the Company will be able to resume repurchases under this program.

knew they could have retained ADS with full rights and protections.  Under this eventuality, such holders will also be entitled to judicial relief.

**E.      The Exchange Offers and the Consent Solicitations Violate the Certificates of Designation**

62.     In addition to coercing ADS holders into tendering their shares, by structuring the Consent Solicitation in this manner, *i.e.* declaring that tendering ones shares constitutes sufficient consent to potentially eliminate the rights and protections of the ADS holders, Holdings has breached the Certificates of Designation governing the Series G and Series H stock.   The Certificates of Designation require the affirmative vote or consent of the holders of two-thirds of the respective series of preferred shares to adopt an amendment that adversely affects the rights of preferred stockholders, which undoubtedly applies to the amendments proposed as part of the Consent Solicitation.  Moreover, stock held by the Company, its subsidiaries, or Affiliates are not entitled to vote.

63.     By tying a consent to the tender of shares, the Company is in effect attempting to vote share it owns, or will promptly own, to eliminate the rights and protections the remaining ADS holders are entitled to in contravention of the Certificates of Designation.  Moreover, it is nonsensical to allow holders who are attempting to give up their ADS to provide consents that will bind and punish holders who wish to retain their ADS.  Such tendering holders will no longer have any interest in ADS and will not be affected by the amendments they are purportedly approving.

64.     The Exchange Offers and Consent Solicitations were structured to destroy the contractual rights of ADS holders so that they will no longer receive the benefits of the Certificates of Designation.  At the very least, these disloyal and coercive tactics violate the implied covenant of good faith and fair dealing that is inherent in every contract, including the Certificates of Designation.

65.     Therefore, the Exchange Offers and Consent Solicitations are both coercive and violate the Certificates of Designation.

## FIDUCIARY DUTIES OF THE DIRECTOR DEFENDANTS

66.     Pursuant to the Marshall Islands Business Corporations Act, the Republic of the Marshall Islands has adopted Delaware corporation law (and the law of other U.S. states with substantially similar provisions), both with respect to statutory provisions and with respect to non-statutory law, insofar as the non-statutory law of Delaware and the U.S. does not conflict with other provisions of the Business Corporations Act.  52 MIRC § 13; *See Metcalf v. Zoullas*, C.A. No. Civ. 3996, 2012 WL 169874 at *3, (Jan. 19, 2012) ("Marshall Islands law… look[s] to Delaware corporate law.").

67.     Like the common law of fiduciary duties under Delaware and New York law, the Marshall Islands Business Corporations Act expressly provides a standard of care that all corporate directors must meet.  Specifically, the Business Corporations Act notes that "[d]irectors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions."  52 MIRC § 61.

68.     By reason of their positions as officers, directors, and/or fiduciaries of Holdings and because of their ability to control the business and corporate affairs of Holdings, the Director Defendants owe fiduciary duties to Holdings and the ADS holders, including the duties of care, loyalty, and good faith, and were required to use their utmost ability to control and manage Holdings in a fair, just, honest, and equitable manner.  Each director of the Company owes to Holdings and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and the highest obligations of fair dealing.

## CLASS ALLEGATIONS

69.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other holders of Series G and Series H ADS that are being, have been, or will be harmed by the conduct described herein (the "Class"). Excluded from the Class are Defendants, and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant, and their successors in interest.

70.     This action is properly maintainable as a class action.

71.     The Class is so numerous that joinder of all members is impracticable. As of September 19, 2016, there were 2,000,000 Series G ADS and 4,800,000 Series H ADS outstanding, held by hundreds, if not thousands, of individuals and entities across the country.

72.     Questions of law and fact are common to the Class, including, among others:

    i.   Whether the Exchange Offers and Consent Solicitations are Coercive;

    ii.  Whether the Exchange Offers and Consent Solicitations violate the Certificates of Designation;

    iii. Whether the Exchange Offers and Consent Solicitations violate the implied covenant of good faith and fair dealing inherent in the Certificates of Designation;

    iv.  Whether Plaintiff and the other members of the Class have been or will be harmed by such misconduct; and

    v.   Whether Plaintiff and the other members of the Class are entitled to injunctive relief or damages as a result of such misconduct.

73.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of other members of the Class and Plaintiff has the same interests as the other members of the Class.

Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

74.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to such adjudications or would substantially impair or impede their ability to protect their interest.

75.     The Defendants have acted or refused to act on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.  Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action.

## COUNT I

**Breach of Fiduciary Duty Against the Director Defendants**

77.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

78.     The Director Defendants, as directors of Holdings, owe and owed the Company and its stockholders, including the holders of Series G and Series H ADS, the highest duties of care, loyalty, good faith, and candor.  Moreover, as directors of Holdings, they have the ability to, and did in fact, exercise control over the wrongful acts of Holdings as described herein.

79.     As explained above, the Exchange Offers and Consent Solicitations coerce ADS holders to tender into the Exchange Offer and violates the Certificates of Designation.  By causing the Company to undertake the coercive Exchange Offers and Consent Solicitations, the Director Defendants have breached their fiduciary duties to the ADS Holders.

80.     As a result, the Plaintiff and the other members of the Class have been harmed.

## COUNT II

### Breach of Contract Against Holdings

81.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

82.     The Certificates of Designation serve as a contract between the Company and the Series G and Series H ADS holders.

83.     The Certificates of Designation require the affirmative vote or consent of the holders of two-thirds of the respective series of preferred shares to adopt an amendment that adversely affects the rights of preferred stockholders.  The amendments to the Certificates of Designation proposed in the Exchange Offers and Consent Solicitations would adversely affect the rights of the ADS holders.  Moreover, the Certificates of Designation prohibit the Company, its subsidiaries, and Affiliates from voting on any such amendments.

84.     By structuring the Exchange Offers and Consent Solicitations in such a way so that tendering one's shares purportedly constitutes valid consent to amend the terms of the Certificates of Designation, Holdings has breached the Certificates of Designation.  In effect, the Company will be voting shares it is acquiring, in violation of the Certificates of Designation, in favor of amendments that remove key rights and protections currently enjoyed by the ADS holders.

85.     Moreover, the Company is attempting to use the purported consents of individuals and entities who are giving up their property rights in the ADS to bind those who are not, in

contravention of the voting protections contained in the Certificates of Designation.  Such tendering holders will have no continuing interest in the ADS and should not be permitted to bind the non-tendering holders.

86.     Holdings has also breached the Certificates of Designation by not taking any steps to amend the Company's Articles of Incorporation after the first time it missed a dividend payment to ADS holders.  The Certificates of Designation require the Company, once it misses one quarterly ADS dividend payment, to use commercially reasonable efforts to obtain an amendment to its Articles of Incorporation to allow the ADS holders to exercise their voting rights.  There is no indication that the Company has taken any steps whatsoever to obtain an amendment to the Articles of Incorporation.  By failing to take such steps, the Company has breached the Certificates of Designation.

87.     As a result, the Plaintiff and the other members of the Class have been harmed.

88.     Plaintiff has no adequate remedy at law.

## COUNT III

**Breach of the Implied Covenant of Good Faith and Fair Dealing Against Holdings**

89.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

90.     Plaintiff brings this count in the alternative to Count II in the event the Court determines that Exchange Offers and Consent Solicitations do not constitute breaches of the Certificates of Designation by Holdings.

91.     The Certificates of Designation serve as a contract between the Company and the Series G and Series H ADS holders.  All contracts, including the Certificates of Designation, contain an implied covenant of good faith and fair dealing that requires the parties to deal with

each other honestly, fairly, and in good faith so as not to destroy the right of the other party or parties to receive the benefits of the contact.

92.    The Certificates of Designation require the affirmative vote or consent of the holders of two-thirds of the respective series of preferred shares to adopt an amendment that adversely affects the rights of preferred stockholders.  The amendments to the Certificates of Designation proposed in the Exchange Offers and Consent Solicitations would adversely affect the rights of the ADS holders.  Moreover, the Certificates of Designation prohibit the Company, its subsidiaries, and Affiliates from voting on any such amendments.

93.    By structuring the Exchange Offers and Consent Solicitations in such a way so that tendering one's shares purportedly constitutes valid consent to amend the terms of the Certificates of Designation, Holding is in effect, voting shares it is acquiring in favor of amendments that remove key rights and protections currently enjoyed by the ADS holders. Alternatively, the Company is attempting to use the purported consents of individuals and entities who are giving up their property rights in the ADS to bind those who are not.  Such tendering holders will have no continuing interest in the ADS and should not be permitted to bind, and destroy the rights of, non-tendering holders.

94.    The proposed amendments to the Certificates of Designation will destroy all material rights the ADS holders were previously entitled to under the contract.  Moreover, the Exchange Offers and Consent Solicitations improperly coerce ADS holders into tendering shares so that the Company can claim it has received valid consents from two-thirds of the respective ADS holders.

95.    If such actions do not constitute a technical breach of contract, they at a minimum constitute a breach of the implied covenant of good faith and fair dealing as they are designed to

24

circumvent and eliminate the rights and protections ADS holders currently enjoy under the Certificates of Designation.

96.     As a result, the Plaintiff and the other members of the Class have been harmed.

97.     Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

a.   Declaring that this action is properly maintainable as a Class Action;

b.   Declaring that the Director Defendants breached their fiduciary duties to the Class;

c.   Declaring that the Holdings breached the Certificates of Designation;

d.   Declaring that Holdings breached the implied covenant of good faith and fair dealing inherent in the Certificates of Designation;

e.   Ordering the Company to restore the rights previously enjoyed by the non-tendering ADS holders;

f.   Ordering the Company to comply with the Certificates of Designation and take commercially reasonable steps to obtain an amendment of the same so that ADS holders can exercise their voting rights;

g.   Awarding damages to Plaintiff and the Class;

h.   Awarding Plaintiff the costs and disbursements of this action, including but not limited to attorneys' fees and expenses; and

i.   Granting such other and further relief as the Court deems just and proper.


DATED: October 7, 2016

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

/s/ *Mark Lebovitch*
Mark Lebovitch
John Vielandi
David MacIsaac
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
MarkL@blbglaw.com
John.Vielandi@blbglaw.com
David.MacIsaac@blbglaw.com

*Attorneys for Plaintiff*

## VERIFICATION

I, Norman Roberts, hereby declare and verify that I am currently an owner of Navios Maritime Holdings, Inc. (the "Company") Series G and Series H American depositary shares, which each represent a $1/100^{th}$ interest in the respective series of the Company's preferred stock and have continuously been an owner of such stock. I have been a continuous owner of the Series G Shares since November 26, 2014, and the Series H shares since December 10, 2014.  I have read the allegations in the Verified Stockholder Class Action Complaint and confirm that the facts alleged therein are true and correct to the best of my knowledge, information, and belief.  I confirm that I am not acting collusively, and am capable of and willing to fairly and adequately represent the interest of the stockholders who are similarly situated in the enforcement of their rights.

I declare under penalty of perjury that the forgoing is true and correct.

Executed this __7__ day of October, 2016.

_____
Norman Roberts

STATE OF FLORIDA

COUNTY OF BROWARD

BEFORE ME, personally appeared Norman Roberts, who is personally known to me or who has produced _Florida Driver_ (type of identification) as identification and did take an oath and is the person described in, and who acknowledged to and before me that he executed said document for the purposes therein expressed.

WITNESS my hand and official seal this ⁊ day of October, 2016.



NOTARY PUBLIC

My Commission Expires: 5-3-20

(Notarial Seal)