UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                                       :
NORMAN ROBERTS, *on behalf of himself*                 :
*and all those similarly situated,*                    :
                                                       :
                                    Plaintiff,         :
                                                       :
                    v.                                 :        16 Civ. 7860 (KPF)
                                                       :
NAVIOS MARITIME HOLDINGS, INC.,                        :        OPINION AND ORDER
ANGELIKI N. FRANGOU, EFSTATHIOS                        :
LOIZOS, SPYRIDON MAGOULAS, GEORGE                      :
MALANGA, JOHN STRATAKIS, AND SHUNJI                    :
SASADA,                                                :
                                                       :
                                    Defendants.        :
                                                       :
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   September 26, 2017

KATHERINE POLK FAILLA, District Judge:

Plaintiff Norman Roberts filed this shareholder class action on October 7, 2016, challenging a self-tender offer that Defendant Navios Maritime Holdings, Inc. ("Navios"), through its Board of Directors, made to the holders of Navios preferred stock. The tender offer initially required any tendering preferred shareholders to consent to certain amendments to the rights associated with their shares, but this required the consent and tender of a supermajority of each of two categories of preferred shares. After the initiation of this litigation, the preferred shareholders twice rebuffed the offer by refusing to tender enough shares to reach the threshold amount to satisfy the supermajority requirement. After the second failed offer, the company extended the tender offer once more, but without the consent and minimum-tender requirements.

Since Plaintiff filed his Complaint, the parties have done little else in this litigation: Defendants have not answered or otherwise formally responded to the Complaint and neither party has appeared before the Court for a conference. Plaintiff claims, however, that Navios's post-filing conduct has mooted the need for the lawsuit. In consequence, he now seeks $900,000 in attorneys' fees under Delaware's "corporate benefit doctrine," reasoning that through this action, Plaintiff benefitted his fellow shareholders by threatening the Navios Board with personal liability for an alleged coercive tender offer and by providing an apparatus for shareholders to resist the tender offer. For the reasons that follow, the Court denies Plaintiff's fee application.

## BACKGROUND[1]

### A.  Navios Maritime Holdings, Inc.

#### 1.  The Capital Structure and the Certificates of Designation for Navios Preferred Stock

The relevant facts are undisputed. Navios is an international maritime shipping and logistics company focused on transporting dry bulk commodities.

---

[1]  The claims in Plaintiff's Complaint, as well as the proffered basis for recovery of attorneys' fees, are predicated on Delaware law. However, as discussed further *infra*, the instant motion requires to the Court to consider the adequacy of the Complaint, and because federal jurisdiction in this case is predicated on diversity, the Court must apply federal procedural rules. *See In re ITT Corp. Derivative Litig.*, 588 F. Supp. 2d 502, 507-08 (S.D.N.Y. 2008); *see also Gasperini* v. *Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).

In deciding the instant motion, the Court has considered Plaintiff's Complaint ("Compl." (Dkt. #1)), and certain documents incorporated by reference in or integral to the Complaint. *See generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). This latter category includes materials appended as exhibits to the declaration of Plaintiff's counsel, Mark Lebovitch ("Lebovitch Decl." (Dkt. #37)). For ease of reference, the Court will refer to Plaintiff's memorandum of law in support of the motion for attorneys' fees as "Pl. Br." (Dkt. #36), Defendant's memorandum of law opposing Plaintiff's motion as "Def. Opp." (Dkt. #38), and Plaintiff's reply memorandum of law as "Pl. Reply" (Dkt. #40).

(Compl. ¶ 11). Navios is a publicly traded company incorporated in the Republic of the Marshall Islands and maintains its principal executive offices in Monte Carlo, Monaco. (*Id.*). The company has issued common stock and two classes of preferred stock that trade exclusively on the New York Stock Exchange ("NYSE"). (*Id.* at ¶¶ 1, 11). The classes of preferred stock are 8.75% Series G Cumulative Redeemable Perpetual Preferred Stock ("Series G") and 8.625% Series H Cumulative Redeemable Perpetual Preferred Stock ("Series H"), each of which trades on the NYSE as American Depositary Shares representing 1/100th interest in a preferred share. (*Id.* at ¶ 35). Both classes have a liquidation preference and book value of $25, and at the time Plaintiff filed the Complaint, Navios had 2,000,000 Series G shares outstanding and 4,800,000 Series H shares outstanding. (*Id.*).

Under their Certificates of Designation, the preferred shares grant shareholders the right to receive cumulative accrued dividends on a quarterly basis and to elect a director to the Board if Navios fails to pay dividends for six quarters. (Compl. ¶¶ 3, 37). In such circumstances, Navios must "use commercially reasonable efforts" to amend its charter to bestow voting rights on preferred stockholders; otherwise, the dividend rate for preferred stock increases by 25 basis points until the company makes the required amendment. (*Id.* at ¶ 40).[2] Furthermore, if Navios fails to pay dividends on the preferred stock, the dividend amounts continue to accrue and Navios must repay any accrued dividends before paying dividends on common stock. (*Id.* at

---

[2] The Complaint does not indicate the rate at which this increase occurs.

3

¶ 37).  And while Navios is in arrears on preferred dividend payments, the company may only redeem any of its stock by making an offer to the preferred shareholders.  (*Id.* at ¶ 41).  Amending these rights requires the consent of two-thirds of the preferred stockholders, and Navios, its subsidiaries, or its affiliates may not use any shares they own to vote on such matters.  (*Id.* at ¶¶ 3, 42).

### 2.    The Dry Bulk Shipping Market

From 2015 through mid-2016, the dry bulk shipping market suffered declines in shipping rates and demand.  (*See* Compl. ¶¶ 28-29).  Consequently, Navios took steps to "reduce [the company's] cash requirements[] without having to sell off assets and while honoring [Navios's] obligations."  (*Id.* at ¶ 30).  These efforts included suspending dividend payments to both common and preferred stockholders, which suspensions Navios announced on February 23, 2016.  (*Id.* at ¶ 31).  Just over three months later, on June 7, 2016, the average closing price of Navios's common stock over 30 consecutive trading days dropped below the NYSE listing standard of $1.00 per share.  (*Id.*).

In September 2016, however, the market experienced an uptick in shipping prices, and the value of Navios's common stock rose above NYSE listing standards.  (*See* Compl. ¶¶ 32-33).  Navios also obtained a loan from one of its subsidiaries, allowing the company to borrow up to $70 million.  (*Id.* at ¶ 33).[3]  Nevertheless, Navios failed to pay dividends to preferred

---

[3]    This loan became central to a shareholder derivative suit that Plaintiff's counsel filed against Navios, alleging that the loan was illusory and would likely never be repaid. (*See* Lebovitch Decl., Ex. B).

stockholders during the two quarters following its February 2016 announcement, and as of the time Plaintiff filed this action, Navios was expected to miss a third quarter in October 2016. (*Id.* at ¶ 38). At that time, Navios's total accrued dividends amounted to $7.4 million and were expected to rise to $11.1 million. (*Id.*). Despite the terms of the preferred stock requiring Navios to amend its charter to allow preferred stockholders to elect a director, Navios had not done so by the time Plaintiff filed the Complaint. (*Id.* at ¶ 40).

**B. The Tender Offer**

**1. The Exchange Offer & Consent Solicitation**

On September 19, 2016, Navios filed forms with the Securities and Exchange Commission indicating that the company would present a self-tender offer to preferred shareholders. (*See* Compl. ¶ 43). The tender offer consisted of an exchange offer coupled with a consent solicitation, and each exchange offer was subject to a waivable condition that two-thirds of each class of preferred shareholders tender their shares. (*Id.*). The exchange offer allowed preferred shareholders to trade shares for either cash or common stock based on the volume weighted average price ("VWAP") of the preferred shares for 20 days of trading on the NYSE before September 19, 2016. (*Id.* at ¶¶ 45-46). Navios offered 110% VWAP for a cash trade or 105% VWAP to trade for common stock, which amounted to Series G shares trading for $5.85 in cash or 4.77 shares of common stock and Series H shares trading for $5.75 in cash or 4.69 shares of common stock. (*Id.*). Navios allowed preferred shareholders to choose between either form of consideration, but would only trade 50% of each

class of preferred stock for cash, with the remaining tendering shareholders receiving common stock. (*See id.* at ¶ 45; Lebovitch Decl., Ex. F).

The consent solicitation attached to the exchange offer required any tendering shareholder to consent to (i) eliminating Navios's obligation to pay preferred stockholders accrued dividends; (ii) eliminating Navios's obligation to distribute dividends to preferred stockholders before common stockholders; (iii) eliminating the prohibition on Navios acquiring any stock unless preferred stockholders had received all accrued dividends; (iv) eliminating Navios's obligation to grant preferred stockholders the right to elect a director or increase the dividend rate on preferred shares if Navios failed to pay dividends for six quarters or more; and (v) lowering the fraction of preferred shareholder consent required to amend the Certificates of Designation from two-thirds to simple majority. (Compl. ¶ 48).

## 2. The Alleged Purpose and Effect of the Tender Offer

The tender offer was scheduled to remain open through October 17, 2016. (Compl. ¶ 44). Before its expiration however, on October 7, 2016, Plaintiff filed the Complaint giving rise to this litigation. (*See* Dkt. #1). The Complaint alleges that Navios's CEO, Angeliki Frangou, in concert with Navios's Board,[4] devised the tender offer to coerce preferred shareholders into relinquishing their rights so that Navios could avoid paying accrued dividends to preferred shareholders and allowing those shareholders to elect a director.

---

[4]     In addition to Frangou, the Navios Board members named as defendants in this action are as follows: Efstathios Loizos, Spyridon Magoulas, George Malanga, John Stratakis, and Shunji Sasada. (Compl. ¶¶ 13-17).

(*See* Compl. ¶¶ 12, 34, 50-61). And, somewhat more deceitfully, the tender offer also allowed Frangou — the holder of 28.5% of all Navios common stock and none of its preferred stock — to reap dividend payments resulting from the company's 2016 upswing in business without first distributing dividends on the preferred stock. (*See id.* at ¶¶ 12, 59).

The Complaint alleges further that by coupling the exchange offers with the consent solicitations, the tender offer violated the Certificates of Designation governing the preferred stock. (*See* Compl. ¶ 62). In Plaintiff's view, by simultaneously seeking the preferred shareholders' stock and their consent, Navios was attempting an end-run around the prohibition on Navios voting on matters that adversely affect the rights of the preferred stockholders. (*See id.* at ¶¶ 63-65). Based on these allegations, the Complaint contains three counts: (i) breach of fiduciary duties against Navios's board; (ii) breach of contract against Navios; and (iii) breach of the implied covenant of good faith and fair dealing (or "the implied covenant") against Navios. (*See id.* at ¶¶ 77-97).

### 3. Plaintiff's Litigation and Its Intended Effects

In an affidavit attached to the instant motion, Plaintiff provides that although he attempted to organize preferred shareholders through an online forum in an effort to stave off the tender offer, he remained concerned that the requisite two-thirds of the preferred shareholders would tender, thus leaving any non-tendering shareholders without the rights that make their shares valuable. (*See* Lebovitch Decl., Ex. G, ¶¶ 6-9). Plaintiff's proffered goals in

bringing this action were thus twofold: (i) to deter the board from pursuing the consent solicitations by threatening Board members with personal liability, and (ii) to offer other concerned shareholders an apparatus by which to oppose the consent solicitation. (*See id.* at ¶¶ 11-12). To these ends, after filing suit, Plaintiff posted the Complaint online for fellow shareholders and advised his counsel to communicate his objectives to defense counsel. (*See id.* at ¶ 12; Lebovitch Decl. ¶ 3). Through affidavit, Plaintiff's counsel states that he indeed had multiple conversations with defense counsel to "ma[ke] clear that if the Company decoupled the tender offers from the consent solicitations ... then [he] and the Plaintiff would consider the claims brought in the action to be mooted." (Lebovitch Decl. ¶ 3).

### 4. The Offer Fails to Satisfy the Minimum-Tender Condition

On October 18, 2016, Navios announced that the consent solicitation failed because preferred shareholders tendered only 371,704 Series G shares and 1,658,678 Series H shares, or 18.5% and 34.5% of each class, respectively, falling far short of the requisite two-thirds per class to satisfy the Certificates of Designation. (*See* Lebovitch Decl., Ex. H). In further pursuit of the exchange offer and consent solicitation, Navios announced that it would extend the deal on revised terms, offering $7.18 in cash or 6.29 shares of common stock per share of Series G preferred stock (an increase per share of $1.33 in cash and 1.52 shares of common stock), and $7.06 in cash or 6.19 shares of common stock per share of Series H preferred stock (an increase per share of $1.31 per share in cash and 1.5 shares of common stock). (*Id.*). On October 31, 2016,

the time for preferred shareholders to tender expired, and on November 1, 2016, Navios announced that preferred shareholders had yet again failed to tender enough shares to satisfy the two-thirds requirement. (*See* Lebovitch Decl., Ex. I). In particular, preferred shareholders tendered only 551,623 Series G shares and 1,969,091 Series H shares, or 27.5% and 41%, respectively. (*See id.*).

### 5. Navios Uncouples the Consent Solicitation from the Exchange Offer and Plaintiff Seeks Fees

In response to this second failure to obtain sufficient shares to satisfy the two-thirds minimum tender condition, the company again extended the tender offer until November 7, 2016. (Lebovitch Decl., Ex. I). This time, however, Navios no longer sought consent solicitations and waived the two-thirds minimum tender condition. (*Id.*). On November 8, 2016, Navios accepted for exchange all preferred shares validly tendered and not withdrawn, amounting to a total of 544,987 Series G shares and 1,898,285 Series H shares. (*See* Lebovitch Decl., Ex. J). Thus, on November 28, 2016, Plaintiff's counsel filed a letter with the Court indicating his intent to move for attorneys' fees in light of the parties' agreement that, "as a result of [Navios's] decision to terminate the Consent Solicitation, Plaintiff's claims … are moot." (Dkt. #32). Plaintiff filed that motion, which seeks $900,000 in fees, on January 10, 2017, and now that it is fully briefed, it is ripe for the Court's decision. (*See* Dkt. #35-40).

**DISCUSSION**

**A.    Applicable Law**

**1.    The Corporate Benefit Doctrine**

The parties agree that Delaware law governs the substantive issues in this motion because Navios is incorporated under the law of the Marshall Islands, which in turn looks to Delaware law.  (*See, e.g.*, Pl. Br. 15; Def. Opp. 7).  *See also Litwin* v. *OceanFreight, Inc.*, 865 F. Supp. 2d 385, 397 (S.D.N.Y. 2011).  Pursuant to Delaware's construction of the "corporate benefit doctrine," courts have discretion to approve an award of attorneys' fees for a shareholder suit against a corporation where, although not resulting in a monetary benefit, the action substantially benefits the corporation or the stockholders in the aggregate.  *See Chrysler Corp.* v. *Dann*, 223 A.2d 384, 386 (Del. 1966); *In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d 353, 357 (Del. Ch. 1999), *aff'd sub nom. First Interstate Bancorp* v. *Williamson,* 755 A.2d 388 (Del. 2000) (unpublished table decision).  Indeed, a plaintiff's counsel may be entitled to fees even "where a defendant corporation takes steps to settle or moot a case and in so doing produces the same or similar benefit sought by the shareholder's litigation." *Allied Artists Pictures Corp.* v. *Baron*, 413 A.2d 876, 878 (Del. 1980).  Such award is appropriate if (i) "the suit was meritorious when filed;" (ii) the "action producing benefit to the corporation was taken by the defendants before a judicial resolution was achieved;" and (iii) "the resulting corporate benefit was causally related to the lawsuit." *Id.*

10

## 2. The Court's Evaluation of Plaintiff's Claims While Sitting in Diversity

As discussed in the remainder of this Opinion, Plaintiff's motion for attorneys' fees falls at the first hurdle, because Plaintiff cannot demonstrate that the claims in his Complaint were "meritorious when filed." Under Delaware law, "[i]n assessing whether a lawsuit was meritorious when filed, the standard the Court will look to is whether the claim would have been able to withstand a motion to dismiss." *In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d at 362 (alteration in original) (quoting *United Vanguard Fund, Inc.* v. *TakeCare, Inc.*, 727 A.2d 844, 850 (Del. Ch. 1998)); *see also Dann*, 223 A.2d at 387 ("A claim is meritorious within the meaning of the rule if it can withstand a motion to dismiss on the pleadings if, at the same time, the plaintiff possesses knowledge of provable facts which hold out some reasonable likelihood of ultimate success."). The burden of demonstrating merit lies with the plaintiff. *See, e.g.*, *Tandycrafts, Inc.* v. *Initio Partners*, 562 A.2d 1162, 1165 (Del. 1989); *Allied Artists Pictures Corp.*, 413 A.2d at 878.

Because this Court is sitting in diversity, the sufficiency-of-the-pleadings analysis is conducted under federal law. *See Gasperini* v. *Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."); *see generally Erie R. Co.* v. *Tompkins*, 304 U.S. 64 (1938). Federal law governs what is substantive and what is procedural for *Erie* purposes. *See Liberty Synergistics Inc.* v. *Microflo Ltd.*, 718 F.3d 138, 152 (2d Cir. 2013). And despite obvious reliance on state law, the Court's analysis of the adequacy of pleadings

is procedural and conducted pursuant to Rules 8 and 12 of the Federal Rules of Civil Procedure. *See Kelly* v. *Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986) (noting that because in federal diversity cases, procedural matters are governed by the Federal Rules of Civil Procedure, "the mode of pleading [the state-law claim] is governed by Rule 8, Fed. R. Civ. P." (quoting *Geisler* v. *Petrocelli*, 616 F.2d 636, 640 (2d Cir. 1980)); *see generally* 5B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1357 (3d ed. 2008).

When considering a motion to dismiss under Rule 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to

relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 678).[5]

## B. Analysis

### 1. The Fiduciary Duty and Contract Claims Were Not Meritorious When Filed

Both Plaintiff's fiduciary duty and contract claims rely on a theory of impermissible coercion. (*See* Compl. ¶¶ 77-88). Specifically, Plaintiff's fiduciary duty claim alleges that "the Exchange Offers and Consent Solicitations coerce [preferred shareholders] to tender into the Exchange Offer and violate[] the Certificates of Designation." (*Id.* at ¶ 79). The contract claim expands on that latter point, alleging that by so coercing the shareholders into tendering their shares, Navios "will be voting shares it is acquiring, in violation of the Certificates of Designation, in favor of amendments that remove key rights and protections currently enjoyed by" preferred shareholders. (*Id.* at ¶ 84). Thus, although Plaintiff styled these claims under distinct legal theories, they rise and fall on the same issue — whether the coercion alleged is actionable. *Cf. In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 615

---

[5] As it happens, Delaware law is substantively identical. *See In re Massey Energy Co. Derivative and Class Action Litig.*, 160 A.3d 484, 496 (Del. Ch. 2017) (noting that, when ruling on a motion to dismiss, a court accepts well-pleaded factual allegations as true, "draw[s] all reasonable inferences in favor of the non-moving party," and asks whether the plaintiff "would [] be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof" (quoting *Savor, Inc.* v. *FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002))).

(Del. Ch. 1999) (holding fiduciary duty and contract claims were equally subject to dismissal if plaintiff failed to sufficiently allege improper coercion or false and misleading disclosures).

### a.    Applicable Law

A plaintiff states a viable claim for wrongful coercion where the allegations in the complaint show that actions by the board have caused shareholders to favor a "proposed transaction for some reason other than the merits of the transaction." *H-M Wexford LLC* v. *Encorp, Inc.*, 832 A.2d 129, 151 (Del. Ch. 2003) (quoting *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d at 620). To be actionable, coercion must rise above "intentionally persuading someone to prefer one option over another" and instead consist of circumstances forcing shareholders "into 'a choice between a new position and a compromised position' for reasons other than those related to the economic merits of the decision." *Gradient OC Master, Ltd.* v. *NBC Universal, Inc.*, 930 A.2d 104, 119 (Del. Ch. 2007) (quoting *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d at 621). The right to be free from wrongful coercion applies to preferred and common shareholders alike. *See id.* at 117 (citing *Eisenberg* v. *Chi. Milwaukee Corp.*, 537 A.2d 1051, 1061-62 (Del. Ch. 1987)).

On the one hand, in cases where Delaware courts have found improper coercion, "the electorate was told that retribution would follow if the proposed transaction was defeated," which is to say, "the electorate was not given an option to remain in their current position." *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d at 621 (discussing *Eisenberg*, 537 A.2d at 1062; *Lacos Land Co.*

v. *Arden Grp., Inc.*, 517 A.2d 271, 277-79 (Del. Ch. 1986)).  On the other hand, Delaware courts have rejected coercion claims where the plaintiff could rationally refuse to succumb to the offer of the corporation.  *See, e.g.*, *H-M Wexford LLC*, 832 A.2d at 151 (rejecting coercion claim that failed to allege that "stockholders were strong-armed into accepting" corporation's offer and holding shareholder who refused to do so "was conclusively not coerced").

A useful point of comparison to this case is *Gradient OC Master, LTD* v. *NBC Universal, Inc.*, 930 A.2d 104 (Del. Ch. 2007).  There, senior preferred shareholders brought coercion claims based on an exchange offer that was part of a proposed restructuring of the corporation's ownership and capital structure.  *See id.* at 110-15.  As part of the restructuring, the company would offer to exchange subordinated debt for senior preferred shares; if senior preferred shareholders tendered more than 90% of their shares, other entities holding substantial stock in the company (the "stock-holding entities") would remain at the bottom of the capital structure and receive preferred stock that would convert into common stock.  *Id.* at 111.  If less than 90% of senior preferred shares were tendered, the stock-holding entities could exchange a large portion of their preferred stock for subordinated debt.  *Id.*  A tender in the 50% to 90% range would also trigger the elevation of a large portion of the stock-holding entities' interest in the company from junior preferred shares to subordinated debt above the preferred stock in the company's capital structure.  *See id.* at 108, 114.  In addition, the tender offer included an "exit consent" provision:  If tendered shares fell between 50% and 90% of all senior

preferred shares, the non-tendering senior preferred shareholders had to relinquish certain protective covenants, including redemption and voting rights. *Id.* at 115, 121-22.

The senior preferred shareholders sued and sought a preliminary injunction, alleging in part that the tender offer was coercive because, by making the effect of the tender offer contingent on 90% participation, it linked a decision not to participate in the exchange offer to the elevation of the stock-holding entities' shares within the company's capital structure. *Gradient*, 930 A.2d at 114. Further, the plaintiffs argued that the exchange offer was coercive because the exit consents would remove protective covenants from non-tendering senior preferred shares if between 50% and 90% of the shares tendered. *Id.* Ruling on the plaintiffs' prayer for a preliminary injunction, the court concluded that the plaintiffs did not have a reasonable likelihood of success because the elevation provisions were simply a complex mechanism to reduce leverage and control the risk of the stock-holding entities while the company delevered. *See id.* at 122-26. Moreover, the court found crucial that the plaintiffs "merely allege[d] the *risk* of being 'put out of the money,'" and "[s]uch a risk is inherent in the bargain a preferred shareholder makes, which … generally includes the possibility that the company later can issue more senior debt or other securities without the preferreds' consent." *Id.* at 126.

Nor did the court find actionable coercion based on the elimination of rights for non-tendering shareholders if 50% to 90% of all senior preferred

shares tendered.  *Gradient*, 930 A.2d at 121-22.  The court reasoned that

"[a]lthough linking the vote on the covenants to the decision to tender

threatens to reduce economic protections to non-tendering holders, the

shareholders, in the aggregate, are free to choose between accepting the new

debt securities (by tendering one's shares), or staying in one's place (and

refusing to tender)."  *Id.* at 122.  Viewed in this light, the plaintiff's claim was

simply an "attempt to put one foot in a new bargain, and still keep the other

foot in the previous game by hedging, through the related covenant protection,

the original bargain."  *Id.*

### b.    Plaintiff Failed to Allege Actionable Coercion

The allegations at issue here are based largely on the same sort of risk

the *Gradient* court held inadequate to establish actionable coercion.  Plaintiff

contends that by linking the exchange offer to the consent solicitation, Navios

required preferred shareholders to either accept the offer "or run the risk of

being left with nothing."  (Pl. Br. 17).  Even assuming these were the only two

options available to preferred shareholders, however, Plaintiff exaggerates the

difficulty that preferred shareholders faced in arriving at an informed decision

based on the merits of the tender offer.  His theory relies on the false

assumption that the preferred shareholders were stuck in a "Prisoner's

Dilemma" (Pl. Reply 1), rendering them incapable of gauging the likelihood that

their fellow shareholders would tender their shares.  *Cf. In re Pure Resources,*

*Inc., S'holders Litig.*, 808 A.2d 421, 442 (Del. Ch. 2002) ("[S]ome view tender

offers as creating a prisoner's dilemma — distorting choice and creating

incentives for stockholders to tender into offers that they believe are inadequate in order to avoid a worse fate." (citations omitted)).  Even before filing the Complaint, by communicating with other shareholders and dispersing his criticism of the tender offer online, Plaintiff coordinated with other shareholders so that all could arrive at an informed decision with respect to the tender offer; in so doing, he disproved his own claim that the preferred shareholders met an insurmountable prisoner's dilemma.

Plaintiff asserts that only after Navios decoupled the consent solicitation from the exchange offer were preferred shareholders able to evaluate the tender offer on its economic merits.  (*See* Pl. Br. 18).  As a practical matter, however, the requirement that shareholders had to tender two-thirds of the shares in both categories of preferred stock to effect the consent solicitation would bolster any rational economic estimate of the likelihood of the consent solicitation passing.  Indeed, the shareholders could assess, in the first instance, whether the consideration offered was desirable, and, if so, the likelihood that other shareholders would arrive at the same conclusion. Although the preferred shareholders may not have been able to account for every one of their fellow shareholders' votes before the tender offer closed, tying the consent solicitation to the exchange offer did not require the preferred shareholders to arrive at a decision detached from the "economic merits" of the tender offer as a whole.  *Gradient*, 930 A.2d at 119.  Instead, the preferred shareholders were able to evaluate the economic pros and cons of the tender

offer and, based on that assessment, the likelihood that enough shareholders would tender so as to reach the two-thirds tender threshold.

Indeed, the tender offer presented no threat of "retribution" if the consent solicitation failed to pass; much to the contrary, the shareholders had "an option to remain in their current position," and they almost all did just that. *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d at 621. The paltry participation percentages relative to the requisite two-thirds participation underscore the view that the shareholders knew that it would be economically feasible to hold their position and were not overly concerned with a mass exodus of other tendering shareholders. At bottom, although tethering the consent solicitation to the exchange offer may have "threaten[ed] to reduce economic protections to non-tendering holders, the shareholders, in the aggregate, [were] free to choose" between tendering and refusing to do so. *Gradient*, 930 A.2d at 122. Moreover, even though Navios had failed to pay dividends for two quarters preceding the tender offer and was expected to miss a third quarter, the preferred shareholders' ability to refuse to tender and remain in the same position availed the various remedies embedded in the Certificates of Designation for Navios's failure to pay dividends. *Cf. Eisenberg*, 537 A.2d at 1061-62 (stating that court would have "difficulty" finding actionable coercion where board refused to pay dividends to preferred shareholders before making tender offer coinciding with historically low stock price, but finding actionable coercion based on board's threats to delist preferred stocks from NYSE).

Plaintiff's arguments to the contrary are unpersuasive. To begin, Plaintiff contends that this case is distinguishable from *Gradient* because that case involved "no change to [the] economic rights of non-tendering stockholders." (Pl. Reply 4). In point of fact, the non-tendering stockholders in *Gradient* faced potentially losing the protection of covenants assuring their voting and redemption rights, which were material benefits of the bargain they struck when they invested as preferred shareholders. *See Jedwab* v. *MGM Grand Hotels, Inc.*, 509 A.2d 584, 593 (Del. Ch. 1986) ("[P]references and limitations associated with preferred stock exist only by virtue of an express provision (contractual in nature) creating such rights or limitations."). Plaintiff's effort to draw meaningful factual distinctions with *Gradient* thus fails.

Pointing to cases such as *Unocal Corp.* v. *Mesa Petroleum Co.*, 493 A.2d 946, 955-58 (Del. 1985), which establish a board's duty to defend shareholders against coercive third-party tender offers, Plaintiff contrasts his allegation that at the behest of Navios's CEO, Frangou, the Board "deliberately created this Prisoner's dilemma, causing the Company to propose the very type of coercive offer the Board has a legal duty to protect against." (Pl. Reply 3). This conclusory argument puts the cart before the horse: the Navios Board would only have a duty to defend against an offer that "they had reasonable grounds for believing [posed] a danger to corporate policy and effectiveness." *Unocal Corp.*, 493 A.2d at 955 (citing *Cheff* v. *Mathes*, 199 A.2d 548, 554-55 (Del. Ch. 1964)). Similarly, Navios and its directors may only be liable for a tender offer that is "actionably" coercive. *Gradient*, 930 A.2d at 117. With these principles

in mind, Plaintiff's argument distills to *ipse dixit*, and the Court will not find

Navios's conduct actionably coercive by simply taking Plaintiff's word for it.

Given this absence of coercion, Plaintiff's fiduciary duty and contract

claims were not meritorious when filed, and the Court may not award

attorneys' fees attributable to those claims. *See Baron*, 413 A.2d at 878.

### 2. The Implied Covenant Claim Was Not Meritorious When Filed

Plaintiff premises his implied covenant claim on the provisions in the

Certificates of Designation requiring the consent of two-thirds of each category

of preferred shares to effect any amendment adversely affecting the rights of

preferred shareholders, and prohibiting Navios, its subsidiaries, or affiliates

from voting on any such amendments. (*See* Compl. ¶ 92). From this, Plaintiff

argues that the Certificates of Designation guarantee preferred shareholders

"the right to a voluntary … vote," but by coupling the exchange offer with the

consent solicitation, the tender offer "rendered the vote involuntary." (Pl.

Reply 5). These allegations, however, fail to rise to the "limited and

extraordinary" circumstances under which Delaware courts find a breach of

the implied covenant. *Nemec* v. *Shrader*, 991 A.2d 1120, 1128 (Del. 2010).

### a. Applicable Law

Under Delaware law, the implied covenant of good faith and fair dealing

applies to any contract, and rather than establishing an affirmative standard

for "good faith," it instead "exclude[s] a wide range of heterogeneous forms of

bad faith." *Dunlap* v. *State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)

(quoting Robert S. Summers, *"Good Faith" in General Contract Law and the*

*Sales Provisions of the Uniform Commercial Code*, 54 VA. L. REV. 195, 201 (1968)).  The implied covenant is "'best understood as a way of implying terms in the agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions."  *Id.* (quoting *E.I. DuPont de Nemours & Co.* v. *Pressman*, 679 A.2d 436, 443 (Del. 1996)) (citing *Glenfed Fin. Corp., Commercial Fin. Div.* v. *Penick Corp.*, 647 A.2d 852, 858 (N.J. 1994)).  Delaware courts describe this exercise of "inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated" as "a 'cautious enterprise.'"  *Nemec*, 991 A.2d at 1125 (quoting *Dunlap*, 878 A.2d at 441).

        In assessing implied covenant claims, Delaware courts look to the express terms of a contract to decide whether the parties "would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith — had they thought to negotiate with respect to that matter."  *Gerber* v. *Enter. Prods. Holdings, LLC*, 67 A.3d 400, 418 (Del. 2013) (quoting *ASB Allegiance Real Estate Fund* v. *Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440-42 (Del. Ch. 2012)), *overruled on other grounds by Winshall* v. *Viacom Int'l, Inc.*, 76 A.3d 808, 815 n.13 (Del. 2013).  To state a claim for breach of the implied covenant, a plaintiff must therefore "allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."  *Kuroda* v. *SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Fitzgerald* v. *Cantor*, No. C.A. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).  "General allegations of

bad faith conduct are not sufficient," and instead, "the plaintiff must allege a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the fruits of the contract." *Id.*

  **b.**  **Plaintiff Failed to Allege a Breach of the Implied Covenant**

  Delaware law does not support Plaintiff's implied covenant claim. First, Plaintiff is arguing, in essence, that by coercing preferred shareholders to tender, Navios ran afoul of both the two-thirds consent requirement and the prohibition on Navios voting on certain amendments to the Certificates of Designation. But "where the subject at issue is expressly covered by the contract … the implied duty to perform in good faith does not come into play." *Dave Greytak Enters., Inc.* v. *Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch.), *aff'd sub nom. David Greytak Enters. Inc.* v. *Mazda Motors of Am., Inc.*, 609 A.2d 668 (Del. 1992) (unpublished table decision). Setting aside the above discussion as to whether Navios in fact coerced the shareholders, the law is well settled that an implied covenant claim may not stand on a violation of the express terms of a contract. *See Kuroda*, 971 A.2d at 888 ("To the extent that [plaintiff's] implied covenant claim is premised on the failure of defendants to pay money due under the contract, the claim must fail because the express terms of the contract will control such a claim."). Plaintiff's implied covenant claim would unravel if the Certificates of Designation did not include either the two-thirds consent provision or the limitation on Navios's voting rights, which shows that the claim is founded on an alleged violation of the terms of the Certificates of Designation. Thus, insofar as Plaintiff alleges a breach of the

implied covenant based on Defendants' failure to honor the terms of the Certificates of Designation, that contract, and not the implied covenant, governs Plaintiff's relief.

Second, and more importantly, had the parties considered trading preferred stock in exchange for consent solicitations while negotiating the express terms of the Certificates of Incorporation, the preferred shareholders would not have agreed that doing so would violate the implied covenant. *See Gerber*, 67 A.3d at 418.  In *Katz* v. *Oak Industries*, a company offered to exchange stock or cash for outstanding debt, while also requiring any tendering bondholders to consent to amendments to the underlying indentures that would "remov[e] significant negotiated protects to" the bondholders "including the deletion of all financial covenants."  508 A.2d 873, 875-78 (Del. Ch. 1986).  The modifications therefore could have negatively impacted non-tendering bondholders.  *Id.*  The bondholders argued, similar to Plaintiff's allegations here, that tying the exchange offer to the bondholders' consent breached the company's duty of good faith in light of contractual provisions that, in part, required the consent of a certain percentage of bondholders to modify the terms of the indentures, and prohibited the company from voting any shares it held on such modification.  *See id.* at 878.

The court rejected the implied covenant claim, reasoning that the indentures did not grant bondholders veto power over modifications to their terms and thus did not prohibit the company from "offer[ing] an inducement to bondholders to consent to such amendments."  *Katz*, 508 A.2d at 881.

Further, the prohibition on the company voting its own securities was designed to prevent the company from voting in a manner that would benefit it as an issuer to the detriment of the bondholders; but trading a bond contemporaneously with granting consent would not conflict with that design because the bondholders shared equal incentives in maximizing their return on investment in the bonds and in participating in the offer. *Id.* The court thus held that although the company clearly "fashioned the exchange offer and consent solicitation in a way designed to encourage consents," it did not "violate[] the intendment of any of the express contractual provisions considered." *Id.*; *see also Kass* v. *E. Air Lines, Inc.*, 1986 WL 13008, at *4-5 (Del. Ch. Nov. 14, 1986) (finding no breach of implied covenant, where company offered consideration to bondholders in exchange for consent to indenture amendments, because company proposed offer to all bondholders and they shared incentive to appraise offer).

This case sits on all fours with *Katz*. The tender offer did not dilute the efficacy of the Certificates of Designation because none of their provisions guaranteed the preferred shareholders veto power over modifications to their terms. Thus, by presenting the offer in exchange for consent to each preferred shareholder on equal terms, the two-thirds consent requirement remained operable. And it indeed operated to block the consent solicitation — twice. Because Navios made the offer to all of the preferred shareholders on identical terms, it allowed each shareholder to assess the offer on its merits and thus presented no risk of benefiting the corporation to the detriment of the

shareholders as a whole.  *See Katz*, 508 A.2d at 881.  The tender offer therefore did not frustrate the purpose of any of the express terms of the Certificates of Designation.  *See Gerber*, 67 A.3d at 418.

Plaintiff latches on to a passage in *Katz* providing that the proposed modifications to the indentures "*may* have [had] adverse consequences to" non-tendering bondholders.  508 A.2d at 877 (emphasis supplied).  (*See* Pl. Reply 5).  In contrast, Plaintiff contends, the non-tendering shareholders here "were guaranteed to have worthless securities if the Consent Solicitations proved successful."  (*Id.*).  But the operative (and fatal) language in Plaintiff's argument is the "if."  Indeed, "if" sufficient shareholders tendered so as to pass the consent solicitations, the remaining preferred shares would have lost many of their valuable features.  The two-thirds consent requirement, however, assured that this would only happen if a supermajority of shareholders found the offer economically rational, which is exactly what the shareholders bargained for by obtaining shares with such protection.

Thus, Plaintiff's implied covenant claim would not have survived a motion to dismiss in the first instance and does not provide ground for an award of attorneys' fees.  *See In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d at 362.

## CONCLUSION

For the reasons set forth above, Plaintiff's motion for an award of attorneys' fees is DENIED.  The Clerk of Court is directed to terminate Docket Entry 35.  Further, because Plaintiff has previously advised the Court that the

26

reasons for his litigation have been mooted (*see* Dkt. #32 at 2 ("The parties agree that, as a result of the Company's decision to terminate the Consent Solicitation, Plaintiff's claims in this Action are moot.")), the Court DISMISSES this action. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case. Either party wishing to restore this case to the active docket must advise the Court on or before October 10, 2017.

      SO ORDERED.

Dated:      September 26, 2017
             New York, New York

                                            _____
                                             KATHERINE POLK FAILLA
                                      United States District Judge